IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ARMOUR ROBINSON,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **Civil Action No. 3:12-cv-3853** |
| **v.** | § | |
| | § | |
| **NEXION HEALTH AT** | § | |
| **TERRELL, INC.,** | § | |
| | § | **JURY DEMANDED** |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S EMERGENCY MOTION FOR
SANCTIONS AGAINST DEFENDANT NEXION
HEALTH AT TERRELL, INC., AND MOTION FOR CONTINUANCE**

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff Armour Robinson and moves this Court to impose sanctions on Defendant Nexion Health at Terrell, Inc. ("Defendant") as a result of Defendant's bad faith designation of Mary Lee Robinson as its 30(b)(6) corporate representative. Plaintiff also seeks an extension of her time in which to respond to Defendant's Motion for Summary Judgment until such time as Defendant's President and CEO Fran Kirley can be deposed. In support thereof, Plaintiff would respectfully show the Court as follows:

BACKGROUND

1.      Plaintiff previously sought to take the deposition of Defendant's President/Chief Executive Officer Fran Kirley in this matter, to determine what he knew about a number of Department of Labor wage and hour investigations into Nexion Health facilities (hereinafter "the DOL investigations"), and what he did with this knowledge.

2.      In quashing Plaintiff's deposition notice of Fran Kirley, this Court ruled in its Order dated April 16, 2014 [DKT No. 28] that Plaintiff should first use less intrusive means before seeking to take the apex deposition of Fran Kirley.   However, this Court also stated that "Plaintiff is…entitled to depose someone with knowledge of the topics at issue" and "Nexion Terrell is thus tasked with the burden of locating the appropriate individual who can testify about the other DOL investigations of Nexion Health companies that involved wage and hour violations."   The Court also noted "should the alternative method ordered *infra* prove inadequate, the Court is willing to revisit the issue to determine whether Kirley's deposition is necessary."

3.      Additionally, this Court also stated that "the corporate representative Nexion-Terrell selects must be prepared to testify about the aforementioned types of DOL investigations that involved the Nexion Health entities in Duncanville, Sherman, Iowa Park, Garland, Flower Mound, Lancaster and Wichita Falls, Texas."   The Court further noted that "Nexion-Terrell is forewarned that if it fails to designate an available, knowledgeable witness who can testify to matters known or reasonably available to it, sanctions may be imposed."   On April 29, 2014, Defendant presented Mary Lee Robinson for her third deposition in this case, this time designated as Defendant's 30(b)(6) representative to discuss the DOL investigations into the Nexion Texas facilities.[1]

---

[1] In her March 12, 2014 deposition Ms. Robinson testified that she was not aware of any DOL investigations into any of Nexion's facilities.  *See* March 12, 2014 Deposition of Mary Lee Robinson, a true and correct copy of which is attached hereto as Exhibit "A", p. 48, lines 21-25; p. 49, lines 1-25; p. 50, lines 1-25. It stands to reason, therefore, that unless Ms. Robinson was subsequently educated about the DOL investigations, she was wholly unqualified to be designated as Defendant's 30(b)(6) corporate representative.

<u>FACTS</u>

4.      To say that Ms. Robinson had little to no knowledge with respect to the only subjects she was designated to testify about would be something of an understatement.   In fact, the *only* knowledge Ms. Robinson possessed about the DOL investigations literally came from reading the summaries of the investigations, often during the middle of her deposition.   A few examples will serve to illustrate this point:

Q.      Okay. So other than what's written in these investigation summaries, do you have any additional knowledge about any of these investigations?

A.      No.[2]

_____

Q.      If you'll go down to the bottom paragraph it says, Status of Compliance.
                                          …
Q.      The second sentence says, "The rounding of hours worked was discussed and the discrepancies outlined."  What can you tell me about that?
A.      From reading it, that it was discussed.  That it was talked about.[3]

_____

Q.      Okay.  Other than the information that is contained in this Exhibit 2, do you have any additional knowledge that you got from additional sources with respect to the facts of this particular investigation?
A.      No.
Q.      Okay.  And do you know what the violation or the violations were in this particular investigation that the DOL found?
A.      I could read you the violations.[4]

_____

Q.      Okay. This is an investigation done at Nexion Health at Garland doing business as Castle Manor, is that correct?
A.      Yes.
Q.      And do you know when this investigation took place?
A.      No.
Q.      Okay, under history at the top—or middle of the page, do you see where it says history, colon?
A.      Yes.

_____

[2] April 29, 2014 Deposition of Mary Lee Robinson, a true and correct copy of which is attached hereto as Exhibit "B", p. 16, lines 2-5.
[3] Exhibit "B", p. 16, lines 22-25, p. 17, lines 1-5.
[4] Exhibit "B", p. 22, lines 18-25, p. 23, line 1.

Q.      It says, "Subject firm has history of two full investigations (Case ID 1218505 and 1244558).   Do you know what investigations they're referring to in that paragraph?

A.      No, other than what I read.[5]

_____

Q.      …Do you know anything about how many employees complained that they had to work through lunch breaks?

A.      At this facility at Castle Manor?

Q.      Yes.

A.      Not without reading it, unless it's in this, no.[6]

_____

Q.      Do you know what the violations were that the investigation found at Cross Timbers?

A.      Not without reading them.[7]

        5.      Oftentimes, Ms. Robinson did not even know to what the reports themselves were referring.  Again, several examples make this point perfectly clear.

Q.      Go down to the third sentence from the bottom.  It says, "Potential CMP's were discussed."

A.      Okay.

Q.      Do you see that?

A.      Yes.

Q.      Do you know what CMP stands for?

A.      No.

Q.      Okay.  It also says, "It was brought to their attention that CMP's may or may not be assessed because corporation has history with the Dallas District Office."  Do you know what they're referring to when they say the corporation has a history with the Dallas District Office?

A.      No.

Q.      Did you do anything to try to find out?

A.      No.[8]

_____

Q.      With respect to the reference to CMP's—do you see that on the page?

A.      Yes.

Q.      --you already testified you don't understand what that stands for.  My question was: Do you think it might be important that you know what that stands for?

        Mr. Brown: Objection; form.

_____

[5] Exhibit "B", p. 24 lines 22-25, p. 25, lines 1-11.
[6] Exhibit "B", p. 26, lines 23-25, p. 27 lines 1-2.
[7] Exhibit "B", p.  30, line 25, p. 31, lines 1-2.
[8] Exhibit "B", p. 29, lines 14-25, p. 30, lines 1-5.

A.    I don't understand why it would be—I would be curious of what it means, but I
      don't know what importance it would have for me.[9]
_____

Q.    Do you understand what this is saying that the dietary manager was doing?
A.    From reading what's on here?
Q.    Yes.
A.    From reading it, it looks like she was trying to give them—she was having them
      to work but promising them inservice time.
Q.    What does that mean?  What does inservice time mean?
A.    I have no idea.  I know what the inservice is, what we call inservice.  I don't know
      what Duncanville…
Q.    Ok.  And as the corporate representative, do you think it might be important to
      know what the terms "inservice days" mean in this particular investigation?
                              …
A.    Without assuming—without assuming, I would say yes.
Q.    Okay.  What sort of investigation did you do to find out what they are referring to
      here when they say "inservice days"?
A.    None.[10]

      6.    Moreover, Defendant's conduct in educating Ms. Robinson about the

DOL investigations, or, to be more precise, in effectively telling Ms. Robinson to educate

herself about the DOL investigations, can at best be described as woefully inadequate.

Ms. Robinson made the following "attempts" to gather facts about the investigations

apart from reviewing the actual investigation summaries:

                              Other Facilities

      7.    On April 23, 2014, Ms. Robinson spoke with the HR Payroll Managers

("Manager" or "Managers") at each of the facilities made the subject of this Court's April

16, 2014 Order (with the exception of the Duncanville facility).[11]  Ms. Robinson asked

each Manager four questions.  First, she asked each Manager how long they had been at

_____

[9] Exhibit "B", p. 32, line 25, p. 33, lines 1-9.
[10] Exhibit "B", p. 44, lines 9-25, p. 45, lines 1-11.
[11] It should be noted that two of the three types of violations the DOL found (affecting at least 21
employees) at the Duncanville facility were for the very same illegal conduct about which Plaintiff now
complains, specifically, that Defendant failed to pay employees for working through their lunches and that
Defendant failed to pay employees for working off the clock at the end of a shift.  The 2012 DOL
investigation ordered Nexion Duncanville to pay over $35,000 in back wages to its affected employees.  A
true and correct copy of the Duncanville investigative summary is attached hereto as Exhibit "C."

their respective facility, and whether they knew anything about the DOL investigations at their facility.[12]  Upon being told no Manager knew about the DOL investigations, she then asked whether each facility's administrator was present during the DOL investigations and whether the administrators would have any knowledge about the DOL investigations.[13]  Once she was told none of the administrators were present during these investigations and allegedly had no knowledge of the DOL investigations, Ms. Robinson apparently considered the matter settled and concluded her interviews with the Managers.[14]  Notably, Ms. Robinson did not attempt to call any of the administrators to verify the information she was provided by the Managers,[15] she did not ask if anyone else in management had any knowledge of the DOL investigations,[16] and she didn't ask if the Managers could find any records related to the DOL investigation at their respective facilities.[17]

<u>Cindy Hamm</u>

8.     Also on April 23, 2014, Ms. Robinson called Cindy Hamm.  As Ms. Robinson had not been able to speak with anyone at the Duncanville facility despite making a total of two (2) phone calls to the facility, she discussed the Duncanville DOL investigation with Ms. Hamm (the DOL investigation summary reveals that Ms. Hamm participated in the opening and final conferences at Duncanville, Exhibit "C", pp. 5-6). Ms. Robinson managed to confirm that Ms. Hamm participated, or was otherwise "in on the [Duncanville] investigation."[18] However, after confirming this fact, Ms. Robinson

---

[12] Exhibit "B", p. 9, line 25; p. 10, lines 1-23.
[13] Exhibit "B". p. 9, line 25; p. 10, lines 1-23.
[14] Exhibit "B", p. 11, lines 4-6.
[15] Exhibit "B", p. 14, lines 6-9.
[16] Exhibit "B", p. 11, lines 10-13.
[17] Exhibit "B", p. 11, lines 7-9.
[18] Exhibit "B", p. 12, lines 9-14.

evidently concluded that she had exhausted all lines of inquiry with respect to Ms. Hamm

and the Duncanville DOL investigation, and did not ask Ms. Hamm any further questions

about Duncanville, or anything else for that matter.[19]

9.       Indeed, Ms. Robinson did not even ask Ms. Hamm if she remembered any

specific facts of the Duncanville investigation.[20]  When Ms. Robinson was asked why she

failed to ask any follow up questions of Ms. Hamm, Ms. Robinson stated "I wanted to

finish reading my notes, but I haven't had a chance to get back with her."[21] Upon being

asked what additional questions Ms. Robinson would have asked Ms. Hamm in the event

she had been able to "get back with" Ms. Hamm, Ms. Robinson simply replied, "I don't

know.  I don't know."[22]

10.      Importantly Ms. Hamm was also involved in the DOL investigation of

Nexion's Castle Manor facility located in Garland. With respect to the final conference

that the DOL held with Cindy Hamm, Ms. Robinson testified as follows:

Q.     Did you ask Ms. Hamm about the investigation that occurred at Castle Manor—
A.     No.
Q.     --in Garland?
A.     No.
Q.     Why not?
A.     I just didn't.  I hadn't gotten back with her.
Q.     Did you think it was important to try to get back with her before today when your
       deposition was going to be taken?
A.     No.[23]

11.      Finally, Ms. Hamm was also involved in the DOL investigation at

Nexion's Crosstimbers facility, located in Flower Mound.  Again, with respect to the

---

[19] Exhibit "B", p. 12, lines 15-19.
[20] Exhibit "B", p. 13, lines 5-7.
[21] Exhibit "B", p. 13, lines 8-12.
[22] Exhibit "B", p. 13, lines 13-15.
[23] Exhibit "B", p. 27, lines 15-25.

final conference in which Ms. Hamm was noted to be a participant, Ms. Robinson

testifies as follows:

Q.    Did you ask Cindy Hamm about the investigation at Crosstimbers?
A.    No.
Q.    Why not?
A.    I didn't know anything about it until I was going through this.  I just didn't.[24]
                                          …
Q.    It appears that Cindy Hamm was involved in this investigation, is that correct?
A.    Correct.
Q.    And you had the ability to talk to her about this investigation, is that correct?
A.    Correct.
Q.    But you did not talk to Cindy Hamm about this investigation, is that correct?
A.    Correct.[25]

    12.    When asked if Ms. Robinson had tried to call Ms. Hamm at any time after

April 23, 2014, Ms. Robinson stated that she had not, because "between my regular work

and this—I—just concentrating on this I just hadn't seen the time to call her."[26]

    13.    In addition to Ms. Robinson's failure to ask Ms. Hamm about the

Duncanville investigation, the Crosstimbers investigation, and the Castle Manor

investigation, Ms. Robinson also admits she could have, but did not, ask Andy Puentes,

HR Field Specialist, about the DOL investigation at Nexion's Sherman facility.[27]  Finally,

Ms. Robinson admits that she could have asked Mike Newton, employed in "corporate

---

[24] Exhibit "B", p. 31, lines 16-21.
[25] Exhibit "B", p. 32, lines 5-13.
[26] Exhibit "B", p. 13, lines 24-25; p. 14, lines 1-5.
[27] The Sherman DOL report reflects a final conference was held with HR Field Specialist Andy Puentes.
Ms. Robinson did not attempt to speak with Mr. Puentes about the DOL investigation because "Andy is no
longer in my region and I just didn't."  Exhibit "B", p. 18, lines 10-14.  Ms. Robinson admitted that if she
wanted to find out additional facts about the Sherman investigation, she could have called Mr. Puentes.
Exhibit "B", p. 18, lines 15-17.

HR" in Maryland, about the Iowa Park investigation, but chose not to.[28]

14.     Lastly, Ms. Robinson testified that she had no idea whether any of the

DOL investigations about which she was designated to testify were reported to Nexion

Terrell's President and CEO, Fran Kirly, or anyone else in Nexion Health's management:

Q.     Do you know whether any of these investigations that we've talked about today
       were reported to Fran Kirley?

                                        …

A.     No.[29]

                                        …

Q.     Do you know if any of these results of these reports were communicated to
       anyone in Nexion Health Management?

                                        …

A.     No.[30]

Q.     Okay.  Do you know whether the results of any of these investigations that we've
       talked about  were communicated to anyone at Nexion Terrell?

A.     No.[31]

## ARGUMENT

15.     When a corporation designates a person to testify on its behalf, the

corporation appears vicariously through that agent; if that agent is not knowledgeable

about relevant facts, and the principal has failed to designate an available, knowledgeable

and readily identifiable witness, then the appearance is, for all practical purposes, no

appearance at all.  *Resolution Trust Corp. v. Southern Union Co.*, 985 F.2d 196, 197 (5th

Cir. 1993).  Just such a non-appearance occurred in this case on April 29, 2014 when

---

[28] The Iowa Park DOL report reflects that a final conference was held with administrator Marcia Jacobi, who Ms. Robinson did not try to contact, and with Mike Newton.  The following exchange occurred:
Q.     Is Mike Newton still with Nexion?
A.     Yes.
Q.     What is his position?
A.     Mike Newton is in our corporate office.  He's corporate HR.  He's in the Maryland office.
Q.     Okay.  Did you try to talk to Mike Newton about the Iowa Park investigation?
A.     No.
Q.     Why not?
A.     I never—I just didn't.  Exhibit "B", p. 24, lines 5-15.

[29] Exhibit "B", p. 52, lines 10-15.
[30] Exhibit "B", p. 52, lines 16-18; p. 53, lines 6-12.
[31] Exhibit "B", p. 53, lines 13-16.

Plaintiff's counsel took the deposition of Defendant's designated corporate representative, Mary Lee Robinson.  As reflected in the deposition excerpts set forth above, Ms. Robinson had absolutely no knowledge about any of the facts that this Court ordered Defendant's corporate representative to be familiar with, i.e., the DOL investigations into the seven different Nexion facilities.  As in *RTC v. Southern*, Ms. Robinson's deposition was completely useless.  *Id.* at 197. As in *RTC v. Southern*, Nexion Health at Terrell, Inc. did not make a meaningful effort to acquit its duty to designate an appropriate witness. *Id.* at 198.  And just as in *RTC v. Southern*, sanctions are appropriate here.  Specifically, this Court should find Defendant in contempt and impose sanctions against Defendant for its refusal to abide by this Court's April 16th Order under Federal Rule of Civil Procedure 37(b)(2).  Plaintiff seeks both the costs and fees involved in preparing for and taking the deposition of Ms. Robinson, as well as in preparing and filing the instant motion.

16.     Moreover, as a less intrusive alternative to taking Fran Kirley's deposition has now been tried and has now failed, Plaintiff requests that she be allowed to depose Fran Kirley about the DOL's investigations into the seven different Nexion facilities. Finally, Plaintiff would also ask that this Court grant her a continuance to respond to Defendant' Motion for Summary Judgment until such time as Mr. Kirley's deposition has been taken.

CONCLUSION

Defendant utterly disregarded its responsibility to designate a corporate representative that had knowledge about the DOL's investigations into the seven Nexion facilities in Texas.  Instead, Defendant gave the DOL investigation reports to Mary Lee

10

Robinson and designated her to, for all intents and purposes, read the reports back to Plaintiff's counsel.  In designating Ms. Robinson in this fashion, Defendant blatantly flaunted this Court's warning that it was subject to sanctions should it fail to designate a knowledgeable witness who could testify to matters known or reasonably available to it. Plaintiff now seeks this Court's intervention to prevent Defendant from benefitting from this type of behavior.

Respectfully submitted,


By: Douglas B. Welmaker
**Douglas B. Welmaker**
State Bar No. 00788641
DUNHAM & JONES, P.C.
1800 Guadalupe Street
Austin, TX 78701
Tel.: (512) 777-7777
Fax: (512) 340-4051
E-mail:  doug@dunhamlaw.com

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF CONFERENCE

I certify that I attempted in good faith to confer with Defendant's counsel John Brown in an effort to resolve this dispute without court action.  Despite this fact, the parties were unable to resolve the dispute.

/s/ Douglas B. Welmaker
Douglas B. Welmaker

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served on May 9, 2014 the undersigned via fax and certified mail to the following, as well as through the Court's ECF system:

VIA FACSIMILE: 214-987-3800
VIA CERTIFIED MAIL 91 7199 9991 7030  0908 5817

Mr. John B. Brown
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8117 Preston Road, Suite 500
Dallas, TX 75225

/s/ Douglas B. Welmaker
Douglas B. Welmaker
